IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARI A. GRAHAM-BABCOCK, | : | Civil No.  1:23-CV-652 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Bloom) |
| | : | |
| KILOLO KIJAKAZI[1], | : | |
| Acting Commissioner | : | |
| of Social Security, | : | |
| | : | |
| Defendant. | : | |

MEMORANDUM OPINION

I.  <u>Introduction</u>

On August 21, 2020, Cari Graham-Babcock ("Babcock") filed an application for disability and disability insurance benefits.  (Tr. 20).  A hearing was held before an Administrative Law Judge ("ALJ"), who found that Babcock was not disabled from her alleged onset date, June 12, 2019, to September 29, 2021, the date the ALJ issued his decision.  (Tr. 22, 36).

---

[1] Martin O'Malley became the Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted as the defendant in this case. Pursuant to 42 U.S.C. § 405(g), no further action is required to continue this suit.

Babcock now appeals this decision, arguing that it is not supported by substantial evidence.  (Doc. 13).  After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019), we conclude that substantial evidence supports the ALJ's decision in this case. Therefore, we will affirm the Commissioner's decision to deny Babcock's claim.

## II.   <u>Statement of Facts and of the Case</u>

On August 21, 2020, Babcock applied for disability and disability insurance benefits, citing an unspecified disability that began on July 12, 2019.  (Tr. 20).  At the time of the alleged onset of her disability, Babcock was 45 years old, had a high school education, and had previously worked as a bank teller and a personal care aide.  (Tr. 33-34).

Babcock's medical records show that, between June 21, 2019 and August 18, 2019, she attended two medical appointments at Bradford Regional Medical Services and one at Cole Memorial Hospital.  (Tr. 415-16, 640, 645).  During those visits, Babcock complained, at various times,

of back pain, neck pain, and migraines that began in August of 2019. (*Id.*).   The treatment notes from all three visits indicate that Babcock was alert and oriented to person, place, and time and was in no acute distress.  (Tr. 416, 423, 640, 645).  Additionally, treatment notes from July and August of 2019 indicate that Babcock's mood, affect, and speech were normal.  (Tr. 416, 640).

On October 8, 2019, Babcock visited Buffalo Rheumatology and Medicine PLLC for an initial consultation and evaluation for fibromyalgia, arthritis, and degenerative disc disease.  (Tr. 551).  During the evaluation, Babcock stated, among other things, that she had a right shoulder labral tear, experienced neck pain and weakness, and felt tenderness and burning in her wrists, fingers, left elbow, shoulders, and lateral hips. (*Id.*).  Treatment notes from that visit indicate that Babcock was alert and oriented, and that she denied having headaches.  (Tr. 552).

On November 19, 2019, Babcock attended a follow-up appointment at Buffalo Rheumatology and Medicine PLLC.  (Tr. 724).  During that visit, Babcock reported joint pain and swelling, trouble walking, overall weakness and, unlike in her previous visit, headaches.  (Tr. 725).  Her

3

treatment notes state that she suffered from fatigue, poor sleep quality, and unspecified cognitive difficulties. (Tr. 727).

Between February and April of 2020, Babcock sought treatment for rectal bleeding, blurry vision in both eyes, a gluteus medius tear, arthritis, and anxiety. (Tr. 471, 591, 597, 1173). During those visits, Babcock was alert and oriented to person, place, and time, did not report neurological or psychological symptoms, displayed normal affect, and spoke clearly. (Tr. 592, 598, 1173). On March 16, 2020, Babcock told her medical provider that the symptoms of her gluteus medius tear had improved. (Tr. 471).

Between May and October of 2020, Babcock attended several follow-up appointments at Buffalo Rheumatology and Medicine PLLC for her fibromyalgia. (Tr. 544, 562, 739). Treatment notes from June of 2020 indicate that Babcock had a history of severe fibromyalgia and that she experienced widespread tendon and muscle burning with light activity. (Tr. 544). Her treatment notes also indicate that the swelling in one of her hips had improved, that one of her medications was ameliorating her pain, and that she was alert and oriented to person, place, and time. (Tr.

544, 562, 740).   Though Babcock reported experiencing headaches in October of 2020, she denied having headaches in May and June of 2020. (Tr. 545, 562, 739).

On November 12, 2020, Babcock visited Bradford Regional Medical Services for an annual physical. (Tr. 774).   During that visit, Babcock stated that she was feeling well and was taking her medication as prescribed. (*Id.*).   Treatment notes from Babcock's physical exam state that she had no pain, exhibited normal ambulation, spoke with clear and appropriate speech, was alert and oriented, and displayed normal mood and affect. (Tr. 774-75).   Several months later, in January of 2021, Babcock visited Allegany Eye Associates complaining of blurry vision, but she denied neurological and psychological problems. (Tr. 1176).

On February 17, 2021, Babcock visited the Olean Medical Group for a neurology consultation, complaining of joint pain and rashes on her hands and face. (Tr. 995).   Babcock informed the doctor that she had daily headaches, severe headaches several times per month, dizziness, blurry vision, and photo- and -osmophobia. (*Id.*).   Babcock was alert, displayed adequate registration and recall, did not require prompting

5

when answering questions, was oriented to time, place, and person, and exhibited normal flow of thought, affect, and mood. (*Id.*). On examination, Babcock was able to follow three-step commands and displayed good execution, concentration, and recent and remote memory. (*Id.*).

On April 7, 2021, Babcock visited Buffalo Rheumatology and Medicine PLLC for another follow-up appointment, complaining of headaches and burning in her hips and hands. (Tr. 1003). Her visit notes indicate that she had severe chronic fibromyalgia, soft tissue pain, excessive daytime fatigue, and unspecified cognitive difficulties. (*Id.*). Her notes also indicate that she was alert and oriented. (Tr. 1004).

Against the backdrop of this evidence, the ALJ conducted a hearing in Babcock's case on September 8, 2021. (Tr. 44-72). Babcock and a vocational expert both testified at the hearing. (*Id.*). Babcock testified that she had a high school diploma and had previously worked as a bank teller and a personal care aide. (Tr. 51-52). However, she testified that she had not worked for over 10 years because both of her shoulders were "torn" and she suffered from fibromyalgia, arthritis, gluteus medius

6

syndrome, a herniated disc in her neck, degenerative disc disease in her spine, anxiety and panic disorder, and migraines. (Tr. 51-53, 55). Babcock testified that she was taking medication for her anxiety and panic disorders and normally took medication for her migraines. (Tr. 56-57). However, according to Babcock, she was unable to take her medication at the time of the hearing because it might exacerbate rectal bleeding that had recently begun. (*Id.*).

Babcock testified that, because of her conditions, she could only drive 10-15 minutes at a time, could not reach directly upwards with her right arm, had to nap two or three times per week, could only walk for one minute without stopping, used a cane, which was prescribed by a doctor, and could only lift the weight of a folder or a plastic plate. (Tr. 51, 54-55, 60). She also testified that she could only look about halfway up and turn her head approximately ¾ of the way in either direction before experiencing pain. (Tr. 58-59). According to Babcock, she could microwave meals and wipe her counters down, but could not scrub, lift laundry out of the dryer, or vacuum. (Tr. 57). Babcock testified that, on a "good day," she could go shopping for about 10-15 minutes before

becoming "panicky." (Tr. 58). When asked what she did to pass time, Babcock testified that she read, watched television, and participated in bible study. (*Id.*).

The court next heard testimony from Jay Steinbrenner, who, as Babcock's counsel stipulated, was a vocational expert. (Tr. 61). Steinbrenner testified that someone with Babcock's RFC could not perform any of Babcock's prior jobs but could work as a telephone solicitor, telephone survey worker, or semiconductor bonder. (Tr. 63-65). Steinbrenner testified that, in the national economy, there were 242,431 telephone solicitor jobs, 33,577 telephone survey worker jobs, and 4,535 semiconductor bonder jobs. (Tr. 64-65). Babcock's attorney briefly questioned Steinbrenner but did not ask him how he determined the number of jobs in the national economy. (Tr. 67-68).

Following the hearing, on September 29, 2021, the ALJ issued a decision denying Babcock's application for benefits. (Tr. 20-36). At Step one of the of the sequential analysis that governs Social Security cases, the ALJ concluded that Babcock did not engage in substantial gainful activity between June 12, 2019, her alleged onset date, and the date the

8

decision was issued. (Tr. 22). At Step 2 of the sequential analysis, the ALJ found that Babcock suffered from 19 severe impairments: right breast carcinoma, fibromyalgia, arthritis, degenerative joint disease of the right shoulder, degenerative joint disease of the right hip, bursitis of the right hip, moderate to advanced gluteus medius syndrome, a labrum tear in the left shoulder, degenerative disc disease of the cervical spine, anxiety disorder, panic disorder, left wrist synovitis, inflammatory poly arthropathy, scoliosis, erythromelalgia, polyneuropathy, polyradiculopathy, migraines, and depressive disorder. (Tr. 22-23). The ALJ also found that Babcock had been treated for hypertension and gastrointestinal conditions. (Tr. 23). However, the ALJ concluded that those conditions were non-severe, as Babcock neither consistently reported symptoms of those conditions, nor required significant treatment for them. (*Id.*). At Step 3, the ALJ concluded that none of Babcock's severe impairments met or equaled the severity of an impairment listed in the Commissioner's regulations. (*Id.*).

Between Steps 3 and 4 the ALJ concluded that Babcock had the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except can occasionally climb ramps and stairs; can never climb ropes, ladders, or scaffolds; can occasionally stoop, crouch, and kneel; and never crawl. No exposure to temperature extremes or extreme humidity, unprotected heights, or hazardous machinery. The person can occasionally reach, including overhead reaching with the bilateral upper extremities. The person can frequently rotate, flex, and extend the neck. The person can frequently handle and finger with the bilateral upper extremities. The person can understand, remember, and carry out simple, routine, repetitive work-related tasks. The person will be off task 5% of the workday in addition to regularly scheduled breaks.

(Tr. 27).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, Babcock's reported symptoms, and the medical opinions rendered by Drs. Giulio Calise, Edwin Malloy, Melissa Lynn Franks, and John David Chiampi. (Tr. 27-33). Ultimately, the ALJ found that Babcock's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the objective medical evidence. (Tr. 28). In making this determination, the ALJ reviewed shoulder imaging from before the onset date, hand x-rays from October 2019, a back MRI from July 2019, a CT scan of the cervical and thoracic spine from May 2019, MRIs of Babcock's

10

hips from March and September of 2020, and a mammogram from July of 2021. (Tr. 29). The ALJ reasoned that the results of those tests, many of which were relatively unremarkable, could not support Babcock's allegations, especially because the treatment record as a whole indicated that her neurological and musculoskeletal functioning was largely intact. (*Id.*).

Similarly, the ALJ noted that Babcock did not receive significant treatment for her impairments. (Tr. 29). In particular, the ALJ noted that Babcock did not receive surgery for her musculoskeletal conditions during the relevant period, and she was given conservative treatment for her hip bursitis, gluteus medius tear, and fibromyalgia. (*Id.*). The ALJ also noted that although Babcock went to the hospital in 2014 for panic disorder, she did not receive inpatient care and only required antianxiety medication. (*Id.*).

Regarding Babcock's neurological symptoms, the ALJ noted that her mental status examinations were largely unremarkable. (Tr. 31-32). The ALJ cited a host of treatment notes showing that Babcock exhibited normal mood and affect during her examinations and was cooperative

11

with medical staff. (*Id.*)  Though Babcock reported excessive fatigue, the ALJ noted that during her examinations, Babcock was alert and oriented and did not display abnormal concentration or require redirection.  (Tr. 31-32).  He also observed that Babcock inconsistently reported having migraine headaches.  (Tr. 31).

Finally, the ALJ found that Babcock's activities of daily living suggested a lower level of impairment than what she had testified to at the hearing.  (Tr. 28).  The ALJ noted that, according to her testimony and her function report, Babcock could drive short distances, care for her pets, make soup, sandwiches, and microwaveable food, walk, shop online and in stores, pay bills, count change, read, participate in bible study, watch television, and spend time with her family.  (*Id.*).  These activities, the ALJ reasoned, were not indicative of severe limitations.  (*Id.*).  In particular, the ALJ found that Babcock's ability to drive suggested that she could concentrate, persist, and handle some degree of stress.  (*Id.*).

After evaluating the objective medical record, the ALJ considered the medical opinions on the record.  (Tr. 32-33).  First, the ALJ noted that there were no non-conclusory opinions on the record from treating or

examining physicians indicating that Babcock was disabled or had substantial limitations. (Tr. 32). The ALJ then considered the opinions of two state medical consultants—Drs. Giulio Calise and Edwin Malloy— and two state psychological consultants— Drs. Melissa Lynn Franks and John David Chiampi. (Tr. 32-33). Those consultants opined, respectively, that Babcock could perform a wide range of physical tasks and had no severe mental impairments. (*Id.*). However, the ALJ found all four opinions unpersuasive, reasoning that Babcock's medical records from after those opinions were rendered supported greater limitations. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Babcock could not perform her past work but found at Step 5 that she could perform other jobs existing in significant numbers in the national economy, such as telephone survey worker, telephone solicitor, and bonding semiconductor. (Tr. 35). Accordingly, the ALJ found that Babcock had not met the stringent standard prescribed for disability benefits and denied her claim. (Tr. 36).

This appeal followed.  On appeal, Babcock challenges the ALJ's decision, citing three purported errors.  (Doc. 13 at 9).  First, Babcock argues that ALJ erroneously accepted the vocational examiner's testimony about job availability, which, she contends, was unsubstantiated. (*Id.* at 11-15).  Second, Babcock contends that the ALJ erred by failing to resolve several conflicts between the vocational examiner's testimony and the Dictionary of Occupational Titles ("DOT"). (*Id.* at 13-14).  Finally, Babcock argues that the ALJ erred by failing to account for her migraines when fashioning her RFC.  (*Id.* at 14-15).  As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be affirmed.

## III.  <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of This Court</u>

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record.  *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d

Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record

as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. 97 at 103 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficien[t] evidence' to support the agency's factual determinations." *Id.* at 102. Thus, the question before us is not whether Babcock is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*,

900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot reweigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

18

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether Babcock: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience, and RFC. 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine Babcock's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all Babcock's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of Babcock's RFC is deferential, and that determination will not be set

aside if it is supported by substantial evidence.  *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

Babcock bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents her from engaging in any past relevant work.  *Mason*, 994 F.2d at 1064.  If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that Babcock can perform consistent with Babcock's RFC, age, education, and work experience.  20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

## C. <u>Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms</u>

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir.2009). Our review of those determinations is deferential.  *Id.*  However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted).  An ALJ should give great weight to a claimant's testimony "only when it is

supported by competent medical evidence." *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted).  As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms.  20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p.  Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record.  SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged

symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p.  During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated when considered in light of the entire case record.  20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's symptoms and how they affect his or her ability to work.  20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings.  SSR 16–3p.  Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms.   20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).   These factors include: the claimant's daily activities; the "location, duration, frequency,

22

and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### D. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record—that is, "only [ ] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 587 U.S. 97 at 103.  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

### 1) The ALJ Properly Relied on the ALJ's Testimony About Job Availability

Babcock first argues that the ALJ erred by accepting the vocational expert's testimony about the number of jobs available in the national economy.  (Doc. 14 at 4-10).  The Commissioner counters that this argument is barred by *Welsh v. Comm'r Soc. Sec.*, 662 F. App'x 105 (3d Cir. 2016) (nonprecedential).  (Doc. 18 at 13).  We agree.  In *Welsh*, the

23

Third Circuit held that the plaintiff could not challenge the vocational expert's testimony regarding the availability of certain jobs because, at the hearing, she "had the opportunity to challenge the vocational expert's methodology and status as an expert, or to offer conflicting testimony regarding specific job numbers available in the region[,]" but failed to do so. *Welsh*, 662 F. App'x at 109. The same logic applies here. Because Babcock did not challenge the expert's methodology at the hearing, she cannot challenge it here. (Tr. 67-68).

However, even if we were to consider Babcock's argument, it would fail on the merits. Babcock argues that the vocational expert did not provide substantial evidence because he failed to provide his methodology for calculating job availability, as required under *Biestek v. Berryhill*. (Doc. 14 at 10) (citing *Biestek*, 587 U.S. 97 at 105). However, *Biestek* did not hold that a vocational expert must provide a methodology. *Biestek*, 587 U.S. 97 at 108. Rather, it held that a vocational expert's testimony may provide substantial evidence even if the expert refuses to produce job availability data. *Id.* Therefore, *Biestek* did not disturb the Third Circuit's preexisting rule that a "'[vocational expert's] recognized

expertise provides the necessary foundation for his or her testimony.'"
*Welsh* 662 F. App'x 105 at 109-10 (quoting *Bayliss v. Barnhart*, 427 F.3d
1211, 1218 (9th Cir. 2005)) (holding that remand was not warranted
where the ALJ precluded the claimant's counsel from questioning the
vocational expert on how she used her personal work experience to
determine local job availability). Accordingly, the vocational expert's
testimony provided substantial evidence for the ALJ's opinion about job
availability.

### 2) The Purported Conflict Between the Vocational Expert's Testimony and the DOT Does Not Warrant Remand

Babcock next argues that the ALJ erred by failing to reconcile two
conflicts between the vocational expert's testimony and the DOT. (Doc.
14 at 10-14). Evidence provided by a vocational expert should be
consistent with the DOT. *Zirnsak*, 777 F.3d at 617. Therefore, an ALJ
must identify and obtain a reasonable explanation for any conflict
between an expert's testimony and the DOT. *Id.* If the ALJ does not
meet this obligation, remand may be warranted. *Id.* However, if the
claimant does not identify a conflict at the hearing, remand is only
warranted if the conflict was so obvious that the ALJ should have

recognized it without assistance.  *Id.* at 619.  Here, Babcock did not raise either of the two purported conflicts at the hearing and the ALJ did not address them independently.  However, as explained below, the first purported conflict was not a true conflict and the second was not so obvious that the ALJ should have recognized it without assistance.

According to Babcock, the first conflict arose when the vocational expert testified that his opinions were consistent with the DOT, except for his opinion on off task rates.  (Doc. 14 at 12).  However, the vocational expert testified that he relied on his 41 years of experience as a vocational expert to calculate off-task rates because those rates were not included in the DOT.  (Tr. 67).  Because the rates were not included in the DOT, there was no conflict for the ALJ to reconcile.  Therefore, remand is not warranted based on the first purported conflict.

Babcock argues that the second conflict arose when the vocational expert testified that someone with Babcock's RFC could work as a telephone solicitor or a telephone survey worker.  (Doc. 14 at 12-14).  According to the DOT, those jobs require "level three reasoning," which is the ability to "[a]pply commonsense understanding to carry out

instructions furnished in written, oral, or diagrammatic form [and d]eal with problems involving several concrete variables in or from standardized situations." *Appendix C,* Dictionary of Occupational Titles, *available at* www.occupationalinfo.org/appendxc_1.html. Babcock contends that jobs requiring level three reasoning are too complex for someone like her, whose RFC is limited to simple, repetitive tasks. (Doc. 14 at 12). The Commissioner contends that this argument fails because, under *Zirnsak v. Colvin*, the conflict was not so obvious that the ALJ should have recognized it without assistance. (Doc. 18 at 17-19) (citing *Zirnsak*, 777 F.3d at 618-19). We agree.

In *Zirnsak*, the **Third Circuit rejected the same argument Babcock now advances after considering three factors:** 1) whether the claimant "seriously argue[d]" that she could not perform the jobs recommended by the vocational examiner, 2) whether the claimant's counsel identified the alleged inconsistency at the hearing, and 3) whether the occupations cited by the expert were merely examples of viable jobs, rather than an exhaustive list. *Zirnsak*, 777 F.3d at 617-19. Here, all three factors warrant the same outcome. First, Babcock does not seriously argue that

she is incapable working as a telephone solicitor or surveyor.  In fact, like in *Zirnsak*, the record suggests that Babcock could perform those jobs, as she had a high school degree, only received conservative treatment, did not have disabling mental impairments, and exhibited normal psychological behavior.  *Id.* at 618-19; (Tr. 26, 28-29, 31-32, 34).   As to the second factor, Babcock's attorney did not identify any inconsistencies between the VE's testimony and the DOT at the hearing.  (Tr. 67-68). Finally, the VE cited the challenged jobs as examples of available occupations, not an exhaustive list.  (Tr. 65).  Because all three *Zirnsak* factors weigh in the Commissioner's favor, any conflict was not so obvious that the ALJ should have recognized it without assistance.  Accordingly, remand is not required based on the second purported conflict.

### 3) The ALJ Adequately Considered Babcock's Migraines

Finally, Babcock argues that remand is warranted because the ALJ did not adequately consider her migraines when fashioning the RFC. (Doc. 14 at 14-15).  She premises this argument on two contentions. (*Id.*). First, Babcock contends that the ALJ failed to consider the duration and severity of her migraines or the treatment she received for them.  (*Id.* at

14).  However, the ALJ explained, with citation to the objective medical record, that Babcock inconsistently reported migraines, did not receive significant treatment for them, and was rarely in distress during her medical appointments.  (Tr. 31, 33).  Accordingly, remand is not warranted based on Babcock's first contention.

Second, Babcock argues that the ALJ should have specifically considered her migraines when calculating her off-task rate.  (Doc. 14 at 15).  However, to the extent that the ALJ committed any error, the error was harmless.  An error is harmless if it would not likely affect the outcome of the proceeding.  *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  The claimant has the burden of establishing that an error was not harmless.  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Babcock has not met her burden.  The ALJ considered Babcock's mental status examinations, which would have revealed concentration deficits caused by any condition, including migraines.  (Tr. 26, 31-32).  Moreover, Babcock has not pointed to any evidence that her migraines would cause her to be off task more than 15% of the time—the maximum off-task rate that an employer would tolerate.  (Tr. 66).  In fact, Babcock

did not testify that her migraines affected her concentration and, as the ALJ explained, Babcock did not consistently report migraines or receive significant treatment for them.  (Tr. 33).  Therefore, Babcock has not shown that the outcome of the proceeding would likely have been different if the ALJ had specifically considered her migraines when calculating her off-task rate.

## IV.  Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and Babcock's appeal denied.

An appropriate order follows.

Submitted this 17th day of June 2024.

*s/ Daryl F. Bloom*
Daryl F. Bloom
United States Magistrate Judge
